```
                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-269
vs.                                )
                                   )
FEDERICO GUILLERMO KLEIN,          )  March 9, 2021
                                   )  2:44 p.m.
                Defendant.         )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

### *(Parties appearing via videoconference.)*

**TRANSCRIPT OF DETENTION HEARING**
**BEFORE THE HONORABLE ZIA M. FARUQUI,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

**APPEARANCES:**

```
FOR THE UNITED STATES:   JOCELYN BOND
                         KIMBERLEY NIELSEN
                         U.S. Attorney's Office
                         For the District of Columbia
                         555 Fourth Street, NW
                         Washington, DC 20001
                         (202) 252-2571
                         Email:  jocelyn.bond@usdoj.gov
                         Email:  kimberley.nielsen@usdoj.gov

FOR THE DEFENDANT:       STANLEY E. WOODWARD, JR.
                         1808 Park Road NW
                         Washington, DC 20010
                         (202) 996-7447
                         Email: stanley@brandwoodwardlaw.com

                         KRISTIN L. McGOUGH
                         400 Fifth Street, NW, Suite 350
                         Washington, DC 20001
                         (202) 681-6410
                         Email:  kristin@kmcgoughlaw.com

ALSO PRESENT:            Da'Shanta' Valentine-Lewis,
                         Pretrial Officer

Transcriber:             Elizabeth Saint-Loth, RPR, FCRR
                         Official Court Reporter
```

**Proceedings recorded by FTR Gold Electronic Recording Software.**
**Transcribed by stenographer via machine shorthand.**
**Transcript produced by computer-aided transcription.**

1                          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  This is magistrate case

3      21-269, United States of America versus Federico Klein.  The

4      defendant is present by telephone.  This matter is set for a

5      detention hearing.

6              Would the parties please introduce yourselves for

7      the record, starting with the government.

8              MS. BOND:  Good afternoon, Your Honor.

9      This is Jocelyn Bond on behalf of the United States.

10             I think my colleague may have been muted.

11             MS. NIELSEN:  Yes.  I was muted.  Thank you.

12     Kimberley Nielsen for the United States.

13             MR. WOODWARD:  Good afternoon, Your Honor.

14     Mr. Woodward on behalf of Mr. Klein.

15             MS. McGOUGH:  Good afternoon, Your Honor.

16     Kristin McGough also on behalf of Mr. Klein.

17             THE COURTROOM DEPUTY:  Your Honor, one quick

18     matter.  Someone has a phone or something that is echoing.

19             THE DEFENDANT:  I believe that's my phone.

20             Federico Klein, Your Honor.  I am currently in a

21     cinder block room which is probably causing the echo.

22             THE COURTROOM DEPUTY:  Thank you.

23             THE COURT:  No problem.  I think it also -- there

24     are also microphones on.

25             THE DEFENDANT:  I could put this on mute until I

```
 1    am directly addressed.

 2              THE COURT:  That would be great.  Thank you,

 3    Mr. Klein.

 4              THE DEFENDANT:  Okay.  Standing by.

 5              THE COURT:  Thank you.

 6              Mr. Woodward, I heard from you, but I didn't catch

 7    your co-counsel's name.  Can you please --

 8              MS. McGOUGH:  Sorry, Your Honor.  Kristin McGough

 9    on behalf of -- also on behalf of Mr. Klein.

10              THE COURT:  Thank you.  Sorry about that, I

11    couldn't hear you before.  So thank you.

12              Ms. Valentine-Lewis, you are still with us?  Yes?

13              MS. VALENTINE-LEWIS:  That is correct, Your Honor.

14    Ms. Valentine-Lewis with pretrial services.

15              THE COURT:  Okay.  Great.  So one moment.

16              Let me -- so, Mr. Woodward, I will start with you.

17    Well, shall I address you or your colleague?  Who will be

18    speaking primarily on behalf of your client?

19              MR. WOODWARD:  I will be speaking primarily on

20    behalf of Mr. Klein, Your Honor.

21              THE COURT:  Great.  Thanks so much.

22              Mr. Woodward, we had your client appear before me

23    previously.  We spoke about a couple of things, about his

24    rights, as well as -- we spoke about the pandemic and the

25    need to go by video -- primarily, when we're able to, to
```

1    ensure the safety of the public and pursuant to the CARES

2    Act and the chief judge's standing order.  I just want to

3    confirm your client continues to waive his personal

4    appearance in this matter and we can proceed by video today.

5            MR. WOODWARD:  I do believe that Mr. Klein will

6    agree to waive his personal appearance given the global

7    pandemic that's affected us all.  And he can tell us if

8    he is -- I have not really had a chance to talk to him, just

9    very briefly; so I have not been able to explain to him the

10   order, but I trust that Your Honor explained that to him

11   last week.

12           THE COURT:  Do you need a moment to just kind

13   of -- I can put you in a breakout room or anything like that

14   if you guys -- if there is anything prior -- in terms of the

15   detention hearing -- obviously, that's my primary concern

16   today.  I want to make sure that he's had an opportunity to

17   speak with you.

18           MR. WOODWARD:  Not yet, Your Honor; but we

19   appreciate the Court's willingness to do that if necessary.

20           THE COURT:  Absolutely.  Okay.

21           So, Mr. Klein, I will remind you -- just as last

22   time when I talked to you, if you need to go in a breakout

23   room, that's not a problem at all.  We are here as long as

24   we need to be; there is no rush.  And it's important that

25   you have an opportunity to have a full and fair hearing.  In

1    order to do that, it means you need to be able to talk to

2    your counsel.

3              Just because we are remote doesn't make that

4    interest and right any less important, so I just defer to

5    you.  I need you to tell me:  Judge, I need to talk to my

6    lawyer; I don't understand what's going on.

7              Okay, Mr. Klein?

8              THE DEFENDANT:  Understood, Your Honor.

9              THE COURT:  Thanks so much.

10             So, Ms. Nielsen, I will come back to you.

11             I believe we have already covered, you know, all

12   of the Rule 5 advisements and the right to remain silent,

13   the right to counsel.

14             So what is before us today is primarily and

15   exclusively a question in terms of detention.  So, as I

16   understood, the government was requesting detention.  I

17   would ask if you could renew your request, and then we can

18   go from there.

19             MS. NIELSEN:  Yes, Your Honor.

20             The government is renewing its request the

21   defendant be retained under 3142(f)(1)(A), as well as

22   under -- if the Court can consider -- (audio

23   unintelligible/interruption) -- Your Honor.

24             UNIDENTIFIED SPEAKER:  Hello.

25             MS. NIELSEN:  And (f)(1)(E), Your Honor.

```
1              THE COURT:  Yes.

2              THE COURTROOM DEPUTY:  Mr. Shelby.

3              UNIDENTIFIED SPEAKER:  Yes.  Hello.

4              THE COURTROOM DEPUTY:  Mr. Shelby, we're done.

5              (Proceeding pauses, interruption.)

6              UNIDENTIFIED SPEAKER:  Okay.  Thank you very much.

7              THE COURTROOM DEPUTY:  Thank you.

8              THE COURT:  Okay.

9              CCB [sic], you can hang up with Mr. Shelby.

10             UNIDENTIFIED SPEAKER:  We can hang up with

11     Mr. Shelby, Your Honor?

12             THE COURT:  Yes.

13             UNIDENTIFIED SPEAKER:  So you are not doing the

14     next district case over CCB [sic]?

15             THE COURT:  Ms. Lavigne-Rhodes.

16             THE COURTROOM DEPUTY:  I'm sorry.  I didn't hear

17     you.

18             THE COURT:  They asked if we have the next

19     district case.  I believe we don't have CCB, that's going to

20     judge --

21             THE COURTROOM DEPUTY:  Yes.  I just spoke with

22     someone about the case; it's going to be before Judge

23     Harvey.

24             UNIDENTIFIED SPEAKER:  Yes.  You talked to me.

25             THE COURTROOM DEPUTY:  Yes.  Phillip will be
```

1      contacting you shortly.

2                     UNIDENTIFIED SPEAKER:  Okay.

3                     THE COURTROOM DEPUTY:  Thank you.

4                     THE COURT:  All right.  Mr. Klein, sorry about

5      that.  We had someone else on the line from a previous

6      hearing.

7                     UNIDENTIFIED SPEAKER:  We are on here with

8      Mr. Mellis.  I am going to turn you over to him now; is that

9      okay?

10                     THE COURT:  Sure.  You can go on mute.  We'll call

11     his case in probably about 30 minutes or so.

12                     UNIDENTIFIED SPEAKER:  Okay.  All right.  Great.

13                     THE COURT:  All right.  Mr. Klein, sorry about

14     that.  We're back here.

15                     I appreciate you saying that you will let me know

16     if there was an issue, then we went to the government.  And

17     they were making their motion which I will ask Ms. Nielsen

18     again to do for -- regarding the basis for detention.

19                     MS. NIELSEN:  Yes, Your Honor.

20                     We're requesting detention under 3142(f)(1)(A) and

21     (f)(1)(E), Your Honor.  And as far as argument is concerned,

22     I can turn that over to my colleague Ms. Bond.

23                     THE COURT:  Okay.  Thank you.

24                     MS. BOND:  Thank you, Your Honor.

25                     And we provided a detention memo to the Court and

1    to counsel earlier today and wanted to be sure that it made

2    it to Your Honor.

3                    THE COURT:  I do have it.

4                    Mr. Woodward, have you and your colleague received

5    a copy of that?

6                    MR. WOODWARD:  Yes, Your Honor; we did receive a

7    copy.

8                    THE COURT:  Okay.  Thank you.

9                    Please proceed, Ms. Bond, by proffer.

10                   MS. BOND:  Thank you, Your Honor.

11                   Our position is that each of the four factors

12   outlined in 3142(g) weigh in favor of detention for

13   Mr. Klein.  We believe that he is a danger to the community

14   and that there is no combination of conditions that will

15   protect the community if he's ultimately released.

16                   And the first is the nature and circumstances of

17   the crime.  The violent and enthusiastic participation and

18   mob violence and the assault against officers here weigh

19   heavily in favor of detention.

20                   And the first thing that I want to draw Your

21   Honor's attention to is that his participation in the

22   violent and dangerous mob -- it was dangerous at both the

23   individual level; it also contributed to the overall

24   violence of that day.

25                   And I am sure that Your Honor has heard a lot

1    about the Capitol riots so far and the overall

2    destructiveness and violence that that involved.  But

3    talking specifically about the lower west terrace where

4    Mr. Klein stationed himself, our evidence puts him there

5    between about 2:40 p.m. and 3:15 p.m. on January 6th.

6              And as we described in our memo, the lower

7    West Terrace was right in front of the Capitol Building.

8    It's front and center; it faces the Washington Monument.

9    It's a part of the Capitol that many Americans are familiar

10   with.  It is a very symbolic place, many inaugurations are

11   held there, and that sort of thing.

12             But pretty quick -- and in the center of that

13   terrace, on January 6th, they were building the inauguration

14   stage.  And as part of that inauguration stage there was an

15   archway right in the center that leads to a center door

16   directly into that -- into the Capitol building.

17             And that particular archway was the scene of a lot

18   of violence that day because pretty quickly after the mob

19   broke onto the grounds, MPD officers and Capitol Police

20   officers together all congregated in that area.  And they

21   ended up spending about two and a half hours throughout that

22   day battling back the mob over and over for hours.  And the

23   mob -- the rioters would come in waves; they would flood the

24   tunnel, they would fight right at the entrance to the

25   Capitol Building.  Sometimes police officers would be able

1    to push the entire mob out and keep them out on the terrace,

2    but then eventually they would be overrun again.  So for

3    this two-and-a-half-hour period, rioters were coming in and

4    out.

5              And Mr. Klein was in that first wave of rioters

6    into the tunnel trying to break into the Capitol Building.

7    And many of those people, including Mr. Klein, had makeshift

8    weapons.  Some people had poles and bats, bear spray at

9    times.  And Mr. Klein ultimately armed himself with a police

10   riot shield.  And our position is that it was stolen from

11   one of those officers who were on the scene.  And we believe

12   that because other rioters are seen on video passing back

13   and forth riot shields that are taken from police officers,

14   and somehow one of those shields ends up in Mr. Klein's

15   hands.

16             And for his crimes that day he is charged with

17   multiple felonies at this point, one of those being a crime

18   of violence, and that's the 111(b), assaulting officers with

19   a dangerous weapon, and that weapon being the riot shield.

20             We described in both our detention memo and our

21   complaint in a lot of detail what he actually was doing

22   while he was in that tunnel.  But once Mr. Klein got off of

23   the terrace and came to the tunnel he was a very

24   enthusiastic participant in the violence and in the officer

25   assault.  He didn't hang back; he wasn't just a bystander in

1    all of this.

2        He made his way to the very front of that line.

3    He went through the tunnel, which was crowded with other

4    people, and made his way to the front where the officers

5    were battling, often hand-to-hand combat, with other

6    rioters.

7        He spent more than 30 minutes, almost close to 40

8    minutes, at that front of the line.  And of course I talked

9    about the riot shield that he actually used against the

10   officers.  While he was at the front he ignored multiple

11   orders from officers to back up.  I think one sergeant

12   shouted it six times trying to get Mr. Klein to back up

13   which he completely ignored.

14       He also ignored officer orders to let it go and,

15   instead, at that moment he takes that clear plastic riot

16   shield and he sticks it inside a door to prevent officers

17   from closing the door and keeping people out of the Capitol

18   Building.

19       A few minutes later he is still using that riot

20   shield right at the front of the line, battling officers and

21   actually physically shoving officers with that riot shield,

22   and it hits one or more officers in that group.

23       While he is in that tunnel he is persistent; he is

24   unrelenting.  And at this point the government doesn't -- or

25   isn't aware of any evidence that he intended to back down or

1    that he intended to give up.  It wasn't until officers

2    deployed pepper spray or OC spray in his vicinity that he

3    was physically unable to keep fighting, and he moved himself

4    away from the front of that line.  For more than 30 minutes

5    he was going without backing down.

6          And not only was he not content with just his own

7    violence, but he was actively encouraging other rioters to

8    do the same.  We have him on camera repeatedly saying things

9    like:  We need fresh people.  And in the context of the

10   video, Your Honor, what's happening is as officers are

11   pushing some rioters out and some rioters are being hit with

12   pepper spray -- those rioters are exiting; they can't fight

13   anymore.  So Mr. Klein is encouraging other rioters, fresh

14   people, to come in and come at these officers.  So not only

15   is he engaging in his own violence, but he is encouraging

16   other people to do so as well.

17         So with respect to the nature and circumstances of

18   the crime, we believe this weighs heavily in favor of

19   detention.  He was dangerous on his own; he was dangerous as

20   part of the overall mob.  He was enthusiastic; he was

21   unrelenting.  And he didn't stop until he had been

22   physically neutralized, and this weighs in favor of

23   detention.

24         Our position with respect to the weight of the

25   evidence also, we believe, weighs in favor of detention.  We

1    believe that the evidence is very strong here; much of

2    Mr. Klein's conduct is caught on video.  It is on body-worn

3    camera video of officers who were on that front line that

4    day.  It captures his face; it captures his clothing; it

5    captures some of his movements and his actions on the front

6    of the line.

7         There are also open source videos that were posted

8    to YouTube and the internet; we referenced them in our

9    complaint.  And those open source videos showed different

10    portions of that day and what Mr. Klein was doing, including

11    that encouragement of other rioters.

12         Not only do we have numerous videos, but there

13    have been several independent witnesses who have come

14    forward to identify Mr. Klein -- people who knew him

15    previously, had met him face-to-face -- including a former

16    colleague from the State Department who was able to look at

17    images from videos captured of this incident and say, yes,

18    indeed, that is Mr. Klein.  So the government's position is

19    that the weight of the evidence weighs strongly in favor of

20    detention.

21         With respect to his history and his

22    characteristics, we recognize that he has a limited criminal

23    history.  There are a handful of arrests and one conviction

24    from the '90s and the early 2000s but no recent convictions.

25         And with respect to his employment, we do know

1    that he was employed prior to January 19th but that he

2    resigned his position at the State Department.  We are not

3    aware of whether he is employed at this point.

4        But 3142(g)(3)(A) -- it asks the Court to look

5    specifically at a person's character, and that's often a

6    very difficult thing to do.  But our position is here that

7    Mr. Klein really demonstrated his character in a very public

8    and visible way; and that's one of a character where he

9    believes himself to be above the law and he is unwilling to

10   keep his word.  And we think that that is a fair

11   characterization of his character here because he took these

12   actions in full -- in broad daylight in front of hundreds of

13   officers who are trying to keep people out of the Capitol

14   Building.  It was very brazen; it was very blatant.  He

15   ignored multiple commands to back up, to let it go.  He

16   completely disregarded those things.

17       Another issue that we think is pretty central here

18   is the fact that he was a State Department employee.  He was

19   a federal employee, under oath to the Constitution -- to

20   uphold the Constitution, to follow that oath, yet he was

21   still there overrunning the Capitol, assaulting officers,

22   doing it enthusiastically, and encouraging others to do so

23   as well.

24       So our position is that he has demonstrated his

25   character loud and clear here; that he does not -- that he

1     puts himself above the law; that he does not value his

2     commitments when he is under oath, and that if he is

3     unwilling to follow the law in this conduct -- in this

4     context, he is going to be unwilling to follow the orders of

5     the Court.  So we believe that that -- that factor weighs in

6     favor of detention as well.

7             And, finally, as far as the nature and seriousness

8     of the danger here -- this of course is a very highly public

9     violation of the law; it was amplified by his federal

10    employment.

11            Your Honor, this was not a youthful indiscretion

12    or somebody who doesn't know better.  Mr. Klein was employed

13    as a federal employee; he had the trust of the federal

14    government, the State Department, and he disregarded that

15    entirely.  He used force, he used a weapon, and he

16    encouraged others to do so as well.

17            So for all of those reasons, Your Honor, we are

18    asking that Mr. Klein remain detained.  We believe that he

19    is a danger to the community, and that there are no

20    combination of conditions that will keep the community safe

21    from him.

22            THE COURT:  Thank you so much, Ms. Bond.  A very

23    thorough review; I appreciate it.

24            I want to hear from Ms. Valentine-Lewis.  Anything

25    you would like to add in terms of recommendation from

1    pretrial or just -- I can rely on the report?

2              MS. VALENTINE-LEWIS:  Not at this time, Your

3    Honor.

4              THE COURT:  Thank you.

5              Mr. Woodward, I am happy to come to you now if I

6    could hear from you by proffer.

7              MR. WOODWARD:  Thank you, Your Honor.  Obviously

8    we oppose the government's request.

9              We are not going to attempt to diminish the

10   seriousness of the events that occurred on January 6th

11   nor -- we similarly agree this is not the proper forum to do

12   so.

13             However, the purpose of today's hearing to

14   determine whether Mr. Klein can safely be released requires

15   you to evaluate several of the proffers and statements that

16   the government has offered.

17             The first thing that I'd point out, Your Honor, is

18   I don't hear the government to be asking for a detention

19   based on anything other than 3142(f); and, if that's the

20   case, we would take the position that the crimes with which

21   he has been charged are, in fact, not violent offenses and,

22   therefore, the Court is not in a position to order Mr. Klein

23   detained.  I presume -- well, I will leave it at that.

24             THE COURT:  One second.  Thanks.

25             Ms. Bond, I am happy to hear from you as to

1    whether you think these are crimes of violence that allow

2    for a detention hearing.

3            MS. BOND:  Your Honor, our position is that

4    111(b), assaulting a federal officer with a dangerous

5    weapon, is a crime of violence.  And we have also raised

6    under -- I think it is (f)(1)(C) that a felony conducted

7    with a dangerous weapon also qualifies for a detention

8    hearing.  And, of course, I have described how he had that

9    riot shield and how he used the riot shield not only to

10   shove against officers who were trying to keep him back, but

11   he used it to prop open a door, and those things.

12           So 111(b) we believe is a crime of violence

13   standing on its own; but we also believe that would qualify

14   as a felony that was conducted with a dangerous weapon.

15           MR. WOODWARD:  Yes.  But I still don't -- Your

16   Honor, I still don't hear the government to be arguing that

17   he should be detained pursuant to 3142(f)(2).

18           And so while we don't contend -- we don't think

19   that the government needs to address whether these are

20   violent offenses, as that term is defined under the statute,

21   we'd reserve the right to brief that for Your Honor given

22   that we only received the government's brief an hour or so

23   ago.  We haven't really had a chance to articulate.

24           What I will say, Your Honor, is that others have

25   persuasively submitted these offenses, including 111(b), are

1   not crimes of violence.  To quote Judge Posner, for example:

2   Inflicting bodily injury on or otherwise causing bodily

3   injury to a person need not connote violence; I am citing

4   the case *Bennett*; that's 863 F.3d. 681.

5         So it may be necessary to address this issue if

6   the government, in fact, is not asking for detention

7   pursuant to 3142(f)(2); but perhaps it makes sense for us to

8   address the four factors and then we can decide whether to

9   turn to the definition of crime of violence under the

10  statute.

11        THE COURT:  Sure.  So as I understand it -- one

12  moment.

13        As I understand it, the government is not going

14  under (f)(2), doesn't believe that there is a flight risk or

15  obstruction; they're purely going under the dangerousness

16  prong of (f)(1).

17        As I understand it -- we have had several of these

18  in our court so far; it seems to be the uniform practice

19  that that does trigger -- is a crime of violence.

20        I am happy to have briefing on that.  I appreciate

21  that you have not had briefing on it now.  I mean, it may be

22  mooted outright if detention is not ordered.  So, I mean, I

23  can't tell you, but I am happy to hear from you.  But I will

24  certainly let you reserve your right; I would love to have

25  briefing on that.  Obviously, that's not what you are hoping

1    and your client hopes it goes, but if that's where we end

2    up, I'd be happy to have briefing on that.  Obviously, also,

3    to have the opportunity if I make a decision that's not in

4    your favor or your client's favor to appeal that to the

5    chief judge; I am sure that's something that you would want

6    to include in your briefing there as well.

7            But based on my understanding of the law, that

8    this is in fact a crime of violence as well, the use of a

9    dangerous or deadly weapon, I think under either prong, is a

10   sufficient basis to have a detention hearing.

11           MR. WOODWARD:  Very good.  Thank you, Your Honor.

12           Regarding the four elements, then -- and

13   beginning, first, with the nature and circumstances of the

14   offense charged, we'd submit that the government's

15   speculation about Mr. Klein's motives --

16           UNIDENTIFIED SPEAKER:  You are done.  You are done.

17           THE COURT:  I'm sorry.

18           Would everybody -- I don't know if that was

19   Mr. Cole or -- I see a couple of folks.

20           MR. COLE:  I apologize, Your Honor; that was me.

21   I am going mute myself.  Please forgive me.

22           THE COURT:  No problem.  It's all good, Mr. Cole.

23   No worries.

24           MR. ABBENATE:  Your Honor, I know you are in the

25   middle -- I just wanted to ask you a real quick question

1    because your clerk was supposed to put me in a breakout room

2    with Mr. Mellis.

3              THE COURT:  No problem.  We'll do that right now.

4              Mr. Lavigne-Rhodes, can you please put

5    Mr. Abbenate in a breakout room with his client,

6    Mr. Mellis -- there it is, under --

7              THE COURTROOM DEPUTY:  Yes, Your Honor.

8              MR. ABBENATE:  Thank you, Judge.

9              THE COURT:  So go ahead, Mr. Woodward.  Thank you.

10             MR. WOODWARD:  Thank you, Your Honor.

11             We were discussing prong one, the nature and

12   circumstances of the offense charged.  We'd submit that the

13   government is speculating in its proffer about the motives

14   of Mr. Klein.

15             To quote the government:  Klein chose to

16   unlawfully enter the Capitol grounds on January 6th for the

17   stated purpose of preventing Congress from completing their

18   constitutional duty.  We don't have any evidence proffered

19   to that effect; that's pure speculation included in their

20   briefing.

21             In addition, I think we can all agree that the

22   events of January 6th were highly charged, very, very

23   emotional.  There are many who are alleged to have

24   participated in these events and not all of them are being

25   detained pending trial.

1          This -- as the Court I am sure is aware -- was an

2     angry mob; and we'd submit that even the government's

3     proffer in the hearing today that Mr. Klein was in

4     possession of a dangerous weapon.  They readily acknowledged

5     that we don't know how he came into possession of that -- of

6     that object.

7          The government submits that he was at the front

8     gate and ignored multiple orders to back up.  Assuming Your

9     Honor has had the opportunity to look at either the video in

10     this case or in any case, this was total chaos; and so we

11     don't think it's fair to describe these events as Mr. Klein

12     ignoring any direct orders from law enforcement.

13          In addition, the government submits in its brief

14     that Mr. Klein -- he did not hang back is a quote, or that

15     he never appeared to turn back or change his mind; and yet

16     glaringly absent from any allegation concerning Mr. Klein is

17     the fact that he was in the Capitol Building itself.  They

18     don't allege that in their complaint; they haven't proffered

19     that today.  In our view, that is a significant fact missing

20     from the government's proffer regarding the requirement that

21     he be detained.

22          Turning then to the second element which is the

23     weight of the evidence against the defendant, Your Honor,

24     we'd submit that the evidence is not quite as strong as the

25     government would have you believe.

1          Obviously, at this point, he is alleged to have

2    been captured on surveillance footage.  The footage is

3    questionable at best; the pictures that the government

4    provides are unclear.

5          In addition, he is alleged to have -- to be a

6    person wearing two different hats; one a Make America Great

7    Again hat, another a red Marine Corps hat.  The government

8    alleges that he switched hats during these proceedings and

9    that this is the same person, but obviously there is a lot

10   to be looked at here.

11         The government alleges that he is wearing a

12   distinctive green jacket; but, you know, as you well know,

13   there are many thousands of people that are on these

14   grounds.

15         None of this, we submit, is overwhelming evidence

16   of his having committed any of the acts with which he is

17   charged.  Moreover, the government readily concedes in its

18   complaint that the majority of people to have identified the

19   person known as 136-AFO identified someone other than

20   Mr. Klein.  One the government contends was a credible

21   identification, which they say is not persuasive because

22   that person's cell phone did not ping a tower in the Capitol

23   Building; but of course the government doesn't address

24   either this factor in their motion today, nor do they

25   address the fact that someone's cell phone may not have been

1    taken with them to the Capitol Building, which is why it's

2    not pinging (audio unintelligible).

3            The government today argues that a former

4    colleague has identified Mr. Klein.  I realize that this is

5    not an evidentiary proceeding, but we know nothing about

6    that identification or the methods utilized in procuring

7    that identification.  All of this is to say --

8            THE COURT:  Excuse me, Mr. Woodward.  I just want

9    to make sure -- I want to make sure -- Mr. Klein, are you

10   still on the line?  My law clerk is concerned you have been

11   dropped.

12           Mr. Klein, are you there?

13           THE DEFENDANT:  Hello.  Yes.  Yes, I am back now.

14   I don't know who put me in a breakout room, but I missed

15   about five minutes.

16           THE COURT:  Okay.  Let's -- we're going to rewind

17   back to -- do you know the last thing that you heard,

18   Mr. Klein?

19           THE DEFENDANT:  Hello.  I don't know how to answer

20   that question, okay.  I have missed about two to three

21   minutes; my counsel was about to explain a few things.

22           THE COURT:  Okay.  Mr. -- I am just trying to

23   figure out how far back --

24           THE DEFENDANT:  Listen, I'd rather things just

25   carry on the way there were; there is no need to back things

1    up for me.  Just please continue, thank you.

2            THE COURT:  Mr. Woodward, I defer to you; it's

3    your counsel -- your client's right.

4            MR. WOODWARD:  I think we ought to proceed, Your

5    Honor.

6            THE COURT:  Okay.  Great.  Thanks.  Thanks,

7    Mr. Klein.  I appreciate it.  Thanks for letting me know.

8            THE DEFENDANT:  Thank you, Your Honor.

9            THE COURT:  If we can --

10           MR. WOODWARD:  By way of summary, Your Honor, and

11   for the benefit of Mr. Klein, with regards to the first two

12   prongs, we're relying on speculative evidence at best.

13           We appreciate that the government is entitled to

14   proffer that; but we obviously contest this proof with which

15   they are entitled to demonstrate, and that is by clear and

16   convincing evidence.  We submit that it's lacking wholly.

17           Turning then to the defendant's history --

18           THE COURT:  Mr. Woodward, you were speaking

19   directly at the time when we -- when I interrupted you; and

20   I apologize, thank you for your patience -- about the State

21   Department colleague also; I was interested to hear what you

22   had to say.  It sounded like you were going to say something

23   about that, I think, perhaps.

24           MR. WOODWARD:  My observation about that

25   identification, Your Honor, is that we know nothing about it

1    other than that it's an employee of the State Department who

2    purportedly has identified Mr. Klein.

3        We know nothing about the procedures or the

4    mechanisms that were utilized in obtaining that

5    identification.  We don't know what images that employee was

6    shown, how well that employee knows Mr. Klein.

7        All of this is entirely circumstantial at this

8    point, which it's allowed to be.  But when you are asking to

9    detain somebody until a trial in the middle of a pandemic,

10   we'd submit that we'd like to see a little more substance

11   behind the government's proof.

12       I think that's a good transition to talk about the

13   defendant's -- Mr. Klein's history and characteristics.

14       As Ms. Bond submitted, the Court has asked to

15   specifically consider a defendant's character.  What do we

16   know about Mr. Klein?  We know that he is a retired Marine

17   and an Iraqi war veteran.  We know that the government has

18   not alleged nor proffered that Mr. Klein served with

19   anything other than honor; and that includes during his

20   tenure at the U.S. State Department where, as you well

21   know -- or know from the complaint, he was issued a top

22   secret security clearance.  And we presume Your Honor knows

23   that that's no simple thing.

24       The government is only arguing as to why

25   Mr. Klein's history and personal characteristics warrant his

1    detention because he allegedly participated in the events of

2    January 6th; but that obviously is not the standard that the

3    Court is to apply in reaching a determination.

4            To the contrary, in a short period of time we have

5    identified at least 17 individuals alleged to have

6    participated in these events who have been released, and a

7    review of the charges levied by the government in those

8    cases is persuasive.

9            Just yesterday, as you probably know, the Court

10   heard the government in Roberto Minuta's case --

11           MS. NIELSEN:  Your Honor, I'm sorry to interrupt.

12   It looks like we lost Mr. Klein again.

13           THE COURT:  Yes.  Mr. Woodward, I'm sorry.

14           Ms. Lavigne-Rhodes, do you know what's going on?

15   Is he in a breakout room?

16           THE COURTROOM DEPUTY:  Your Honor, I am trying to

17   figure it out.  I don't know where he went.  Give me one

18   second.

19           THE COURT:  Is it a breakout room?  This has never

20   happened before, so I am just not sure what's going on.

21           MR. WOODWARD:  I think Mr. Klein may be back.

22           THE COURTROOM DEPUTY:  Mr. Klein, are you there?

23           THE DEFENDANT:  I am back, Your Honor.

24           THE COURTROOM DEPUTY:  Okay.  Mr. Abbenate, give

25   me one second.

1          THE DEFENDANT:  I am back.

2          THE COURT:  Okay.

3          MS. NIELSEN:  I apologize for interrupting,

4    Mr. Woodward and Your Honor.

5          MR. WOODWARD:  No.  Ms. Nielsen, it's appreciated.

6    Thank you.

7          THE COURT:  Thank you.

8          THE COURTROOM DEPUTY:  That should be it, Your

9    Honor.

10          THE COURT:  Okay.  Thanks.  Hopefully we got that

11    fixed.

12          Mr. Woodward, you were speaking about the

13    history -- the character of the defendant.

14          MR. WOODWARD:  Yes, Your Honor.

15          And I was -- in addition to making the observation

16    that Mr. Klein's character is outstanding, frankly, in

17    comparison to other individuals who have now been detained,

18    the facts and circumstances here don't warrant his

19    detention.

20          The first -- the most recent example is that of

21    Roberto Minuta; that's 21-MJ-260.  He is alleged to have

22    been equipped with military-style attire and gear, including

23    apparel emblazoned with the Oath Keepers' militia.  He's

24    alleged to have deleted his Facebook account after the

25    events of January 6th.  He is alleged to have entered the

1    Capitol Building with hard knuckle tactical gloves,

2    ballistic goggles, a radio with an earpiece, and possibly

3    bear spray.  Publicly available photographs depict him

4    inside the building in contrast to Mr. Klein.

5            The government alleged -- and I quote:  I think

6    this is not a stretch to think Mr. Minuta, if called upon to

7    do so, would participate in an armed rebellion yet again

8    even on pretrial release, end quote.

9            The government is not alleging that here today,

10   and yet Mr. Minuta was released on special circumstances --

11   rather, on court-ordered circumstances.

12           Also yesterday is the case of Isaac Sturgeon,

13   21-MJ-104, who is alleged to have picked up a metal police

14   barricade and shoved the barricade into MPD officers, who is

15   alleged to have flown to Africa on January 24th and whom the

16   government had to have extradited back to the United States;

17   released.

18           Roberto -- rather, Robert Sanford, 21-CR-86,

19   videotaped hurling a fire extinguisher at a group of police

20   officers, striking three in the head including one without a

21   helmet; released.

22           Chad Jones, 21-MJ-76, he is filmed using a

23   flagpole to repeatedly and forcefully strike and break the

24   glass window where we all now know that Ashli Babbitt was

25   shot and killed.  The government did not request Mr. Jones'

1    detention, and Magistrate Harvey released him on special

2    condition.

3            Vitali Gossjankowski, 21-CR-123, charged with

4    assaulting a federal officer with a Taser.  And in the

5    government's complaint they allege that an officer here

6    specifically suffered a heart attack after having been tased

7    in the neck.  Again, the government did not object; and the

8    Court did release him.

9            Matthew Miller, 21-CR-75, charged with discharging

10   a fire extinguisher and accused of using a crowd-barrier

11   fence as a makeshift ladder.  The Court ordered Mr. Miller

12   released subject to special conditions.

13           Mark Leffingwell, 21-CR-5, charged with pushing

14   past a wall of law enforcement officers and repeatedly

15   punching an officer with a closed fist.  Again, the

16   government did not oppose Mr. Leffingwell's release.

17           Your Honor, I have ten more similar cases in which

18   the facts and circumstances are far more serious than what

19   Mr. Klein has been alleged to have done; I can obviously

20   brief the Court on that, if they'd like.  But we would note

21   that --

22           THE COURT:  I think you have made your point

23   pretty persuasively, Mr. Woodward; I get what you are

24   saying.  No.  I think I don't need to hear those.

25           You are welcome to, if you want to, but I think

1    you have made the point very well.

2            MR. WOODWARD:  Well, I will turn then to whether

3    Mr. Klein is a danger to the community, which obviously we

4    dispute.

5            Once again, the government argues that, quote:

6    The United States is gravely troubled by the nature of the

7    allegations against him and his potential threat to others

8    if released.  And yet their only concern is that he was

9    allegedly at the events of January 6th.  They have proffered

10   no evidence of his having done anything to suggest that he

11   otherwise would present a danger to the community.

12           Specifically, we would point to Judge Lamberth's

13   opinion yesterday regarding the detention of Justin --

14   Jacob, rather, Chansley.  And in Judge Lamberth's order, I

15   am requiring Mr. Chansley's detention -- he observes that

16   Chansley publicly and proudly displayed his intent to

17   disrupt the legitimate functions of our government; there is

18   no allegation that Mr. Klein did so.

19           Judge Lamberth observes that leading up to the

20   events of January 6th, Mr. Chansley indicated his

21   willingness to halt those functions by means of violence;

22   again, there is no indication that Mr. Klein did any such

23   thing.

24           To quote Judge Lamberth:  Shedding light on

25   defendant's actions and distinguishing him from many others

1    present that day are the statements that Chansley made

2    leading up to and on January 6th; statements on Twitter

3    promoting, identifying -- excuse me -- statements on Twitter

4    promoting the identity and then hanging of those he believed

5    were traitors within the U.S. government, or the fact that

6    Chansley literally wrote on the dais where Vice President

7    Pence was sitting that read:  It's only a matter of time,

8    justice is coming.  And during and after the events, quote,

9    thanking God for allowing us to get rid of the communists,

10   the globalists, and the traitors within our government.

11           Again, the government has not alleged or even

12   proffered that Mr. Klein has done anything rising to this

13   level warranting the determination that Mr. Chansley be

14   detained.

15           We submit that considering all of the factors, as

16   the Court must, the government has failed to prove -- to

17   meet its burden of proving by clear and convincing evidence

18   that no condition or combination of conditions would

19   reasonably assure the safety of any other person or the

20   community.

21           Thank you, Your Honor.

22           THE COURT:  Thank you very much, Mr. Woodward.

23           Ms. Bond, anything you want to respond briefly to?

24           MS. BOND:  Yes, Your Honor.  A few points.

25           With respect to the nature and characteristics of

1    the crime, of course we can't read his mind, we don't know

2    exactly what his motive was; but I do want to point out that

3    there were many opportunities for Mr. Klein to turn back.

4          He was in that tunnel for more than 30 minutes.

5    There were times when the crowd backed up; he could have

6    turned around, he could have walked out, and he didn't.  And

7    I think that's a lot of evidence of his commitment to

8    getting through those doors and into that Capitol Building

9    where it's well documented as to what proceedings were going

10   on inside of that building.

11         With respect to the weight of the evidence, I do

12   want to mention the switched hat issue.  And we describe it

13   in our complaint, how it appears that at one point the hat

14   falls off and he looks around and picks up a different hat.

15   I do want to note that in order of time the switching of the

16   hat happened after he is inside of the tunnel.

17         So inside of the tunnel we're proffering that he

18   was wearing that Make America Great Again hat; and it wasn't

19   until all of those police officers assaults had been

20   completed that the hat switches.

21         We also have the issue of the cell phone.  And

22   defense counsel mentioned the fact that another person

23   who -- there had been a tip about a different person whose

24   cell phone didn't ping.  Well, Mr. Klein's cell phone did

25   ping.  We did get a hit on his cell phone number coming up

1    in and around the Capitol grounds; so we are able to confirm

2    that his cell phone at least was present there.

3          We also have that State Department colleague who

4    worked for him -- with him for almost four years.  And there

5    are details that we have provided in our complaint; they

6    worked together several years, saw each other multiple times

7    per week.  And, in fact, this other employee last saw him on

8    January 19th of 2021.

9          Finally, with respect to the security clearance,

10   defense counsel mentioned that -- and I want to point out

11   that he did have a top secret security clearance, and he

12   really squandered that.  The government trusted him.  He was

13   given access to a lot of very sensitive information, and he

14   turned around and essentially attacked his own government

15   even though he possessed that clearance.

16         With respect to the final list of other cases

17   where people have been released, ultimately, Your Honor, the

18   government's position is that it's irrelevant whether other

19   people have been released or detained because 3142(g) is so

20   highly personal to the individual, to the crime that they

21   committed, who they are, and what their life circumstances

22   are.

23         So I heard in defense counsel's list a number of

24   different cases where people were released, and I want to

25   point out distinctions.  There were only one or two in there

1    where other people were actually accused of assaulting

2    officers as Mr. Klein has been.  There is no information in

3    the list that defense counsel provided how long those people

4    were engaged; so we don't know if those people were

5    momentarily engaged in a one-off or if they, like Mr. Klein,

6    were, for more than 30 minutes, determined to get through an

7    entrance.

8         We also have -- he compared Mr. Klein to

9    Mr. Chansley; of course, that's been a highly-publicized

10   decision.  And Mr. Chansley, like others, was not accused of

11   any violence.  The accusations against him are disturbing;

12   he was in the Capitol.  But Mr. Klein and Mr. Chansley are

13   not similarly situated.  They are very different

14   individuals; they committed different crimes, and they are

15   charged as such.

16        Finally, Mr. Klein, again here, is a federal

17   employee.  He knows better; he knows the law.  He knew what

18   he was doing.  And we don't have any information, and it

19   wouldn't be appropriate, to compare him to those other

20   defendants.

21        MR. WOODWARD:  Your Honor, if I may just make one

22   brief comment.

23        THE COURT:  Yes.

24        MR. WOODWARD:  The government is focused on this

25   allegation that Mr. Klein could have, should have turned

1    back.

2         What the government does not -- what the

3    government does not know is that in their complaint they

4    acknowledge that this person alleged to have been Mr. Klein

5    actually assisted a police officer who had been dragged away

6    from the barricade, from the line, and got him back to his

7    colleagues.

8         So the government's submission that because he

9    didn't turn back, that he was in there for 30 minutes, we

10   have watched that video, Your Honor.  It was chaos, to put

11   it simply, and Mr. Klein should not be detained pending

12   pretrial.

13        Given the facts and circumstance of the world in

14   which we find ourselves, we don't know when he'd actually be

15   able to get a trial because as -- to quote Ms. Bond:  He is

16   a federal employee and he knows better -- that's not the

17   standard.  And, Your Honor, we would respectfully request

18   that he be released pending of course -- or, rather, subject

19   to the conditions we expect you to order.

20        THE COURT:  Thank you.  One moment.

21        (Proceeding pauses.)

22        THE COURT:  Okay.  Thank you.

23        So I am going to go through the four factors as I

24   understand it.  And I noted earlier the government is moving

25   based on a belief that the defendant is a danger to the

1   community, as stated by the government and argued by defense

2   counsel.

3          The standard is clear and convincing evidence,

4   which is certainly higher than the standard for -- were the

5   defendant a flight risk or a threat to obstruct justice or

6   any of the, sort of, bases; this is the highest standard,

7   and that's because the defendant is presumed innocent.

8   Because he is presumed innocent it has to be an

9   extraordinary circumstance where there is no condition or

10  combination of conditions that would justify his release, an

11  innocent person, to the public.

12         And so I go through the four factors -- and I will

13  step through them as I go through them here to ultimately

14  make my decision.

15         I want to go over two things up front.  First, my

16  decision is my decision and my decision alone.  I think

17  that, to that end, there is always the opportunity to go

18  before the chief judge; she will review these *de novo* --

19  fresh, anew.  She is looking at these from a clean slate to

20  Mr. Klein and to the government.

21         These aren't -- I think it's helpful to hear about

22  how other cases have come out.  I think there is always in

23  the law an enigma to any judge the idea that the law is

24  arbitrary or, you know, is disproportionately applied in

25  different ways.  But every fact -- every case has its own --

1    has its own unique history and its own unique facts, and

2    everyone comes to matters with their own biases; but the job

3    of the judges is to look at the case that's in front of

4    them.

5         I can't speak as to what has happened in certain

6    other matters, but I think -- and so in raising them,

7    Mr. Woodward has raised good points.  But, again, ultimately

8    I am deciding the issues before me today with the facts

9    before me today, and there always is an opportunity for the

10   parties -- if they do not feel that that is the appropriate

11   outcome, they can appeal it through the chief judge as early

12   as today or whenever they may see fit.  So that's the first

13   issue.

14        The second is I don't like waiting until the end

15   because I think it's unfair to the parties to kind of wait;

16   so I will first tell you how I will rule, and then I will go

17   through the four factors.

18        I think that this was a difficult decision because

19   I think, frankly, there are arguments that make a lot of

20   sense on both sides here; but ultimately in my mind there is

21   a danger to the community, and so I find that detention is

22   appropriate.  I will go through the factors now.

23        The nature and circumstances of the charged

24   offense, I think that -- guided by my colleagues in this

25   court and some of the statements that they have said, as

1    noted by the chief judge in the *United States versus*

2    *Chrestman* which is cited in the government's brief:  The

3    actions of the violent mob, particularly those members who

4    breached police lines and gave entry to the Capitol are

5    reprehensible as offenses against morality, civic virtue,

6    and the rule of law.  I agree with the chief judge that the

7    nature of these charged offenses does not, even when they

8    are felonies, capture the great magnitude of what was trying

9    to be done.

10           I understand the defense counsel's proffer that,

11    you know, we can't read minds -- and it is not our job to

12    read minds, frankly, as deciders -- all we can do is go on

13    the facts before us.

14           But the government did proffer facts about the

15    statements of the defendant regarding -- at least in one

16    instance that he spoke about the election and that the

17    government is inferring from that that the defendant was

18    there to -- when he said, We just want a fair election, and

19    was demonstrating where he was, that he was there in part

20    to -- because of his belief that the election was

21    fraudulent.  So we can't look at that statement in a vacuum;

22    we have to look at where was the defendant.  The defendant

23    was in the protected Capitol grounds.  What time was it?  It

24    was during the -- when the election was being certified, the

25    Electoral College; the Constitution was being followed and

1    the due process of law.

2            So I would agree that in a vacuum that statement

3    certainly -- albeit objectively wrong -- is that there is --

4    that's not what the question is.  The question is, well,

5    when someone is saying that in what is described by both

6    parties as a chaotic riot -- so I think that the defense --

7    I'd say a lot of arguments persuaded me; but I was least

8    persuaded by this argument that the defendant can't be held

9    responsible for -- or is less responsible for what happened.

10           When you are in a chaotic riot, who knows what is

11   up or down.  Well, the defendant placed himself in that

12   chaotic riot.  And this was not a riot with many people on

13   different sides; this was one group of people who were

14   uniformly trying to do one thing which was to stop the

15   lawful process of democracy.  So there was not a chaotic

16   riot of infighting; there was a chaotic riot of law

17   enforcement trying to protect the democracy of the United

18   States of America and people trying to breach the line and

19   prevent that from occurring.  So while there was chaos, it

20   was self-induced by the people who decided to go there; and

21   so, in that instance, I don't feel that in any way the fact

22   that it was chaotic excuses what happened.

23           Now, I will say to the defense's credit, I think

24   the defendant wisely chose to not mitigate or minimize what

25   occurred in general and was simply focusing on the

1    defendant; so I look only to the defendant's conduct,

2    though, here because I think the defense is right.  That's

3    the key issue; and there is a later date to litigate some of

4    those issues, and that's not frankly before me, nor will it

5    be.  But I do believe that the nature of the offense cannot

6    be understated.

7         I think in addition -- we'll weave through all of

8    the factors; but let's talk about the history and

9    characteristics as to why I think this defendant is situated

10   in a fashion that justifies the detention here.  But I will

11   add, as I talk about the history and characteristics -- I'm

12   sorry -- the nature and circumstance of this offense, I

13   think that where the defendant was as proffered by the

14   government -- and they are permitted to go by proffer --

15   that this was one of the most dangerous areas where there

16   was fighting occurring.

17        And the defendant's participation means that he

18   was in an area of the nature and circumstance of the offense

19   I look at, this defense conduct was particularly trouble; it

20   was where there was violence, and the government has

21   proffered that the defendant was violent with police

22   officers.  So I think, for that reason, the nature and

23   circumstance of the offense, the gravity of the attempt to

24   preclude the lawful administration of the democratic

25   process, means that it was -- in fact, the nature of the

1    circumstances justify detention.

2            I will next go to the weight of the evidence.  I

3    think the weight of evidence is strong.  This is, in my

4    mind, the least important of the categories, but it is, I

5    believe, very strong evidence.

6            I think the government's complaint identified that

7    there was a State Department employee who was very familiar

8    with the defendant and identified the defendant as the

9    person in the video.

10           I believe also that cell phone evidence presented

11   now by proffer by the government corroborates the defendant

12   was there.  And I think that the other witness statements as

13   well -- again, this defendant -- certainly as defense

14   counsel noted, there were other people who were alleged to

15   have been this person in the police photo that was released;

16   but it seems like the government did its due diligence to

17   show that it was not those other people and was, in fact,

18   the defendant.  So, for that reason, I think the weight of

19   the evidence is strong.  But, again, I think that is -- of

20   the four factors, that's the least important.

21           I think the history and characteristics of the

22   defendant -- first, I think it's worth noting always when we

23   have a service member before us, the lawful process of our

24   democracy is both because of the electors and the electorate

25   going through, but it's also because of our service members

1    who fought for the freedom -- and our freedom, all of us in

2    this courtroom, and for the opportunity to have this hearing

3    here.  So I appreciate and admire and respect the defendant,

4    and he deserves to be honored and credited for his service.

5            He was also a public servant with apparently a top

6    secret clearance, indicating to me that he was in some

7    position of authority in the government; and, again, that is

8    service that should be recognized and commended.

9            On the other side, I consider the characteristics

10    of the defendant.  I look to what the government has

11    identified -- you know, I look at two things.  And in the

12    sentencing guidelines, you know, we consider if someone is

13    an organizer, manager, supervisor; we also look at if

14    they're in a position of trust; and both of those are things

15    that enhance or raise concern.  I think both are appropriate

16    here -- appropriate concerns for me.  I think that the

17    defendant's role as a top-secret-cleared government official

18    with prior military service only makes me have greater

19    concerns about his characteristics.

20            How someone who was sworn to defend the

21    Constitution of the United States of America against all

22    enemies, foreign and domestic, could then participate in an

23    attempt to stop the administration of the Constitution of

24    the United States.  There were enemies, domestic, directly

25    at the heart of the American -- the heart of America's

1    democracy, and a person who had sworn an oath to protect

2    that then, you know, switched sides; and so that's extremely

3    concerning.

4         I think that his position of trust and position of

5    authority both makes him someone who I am more concerned

6    about that, you know, as danger goes on, that he is someone

7    who still has that imprimatur of the government -- a former

8    government official; and that, you know, it's not hard to

9    believe or imagine that we have seen and had allegations in

10   this court from other people who have and have not been

11   released is that when present or former government officials

12   direct them to do things, they are more likely to believe

13   that there is a lawful basis for them to then go and try to

14   overturn this election.  So I think the defendant's

15   character of being a government official is something that I

16   consider greatly.

17        In terms of his being a leader, I will talk about

18   that in a final category.

19        In terms of -- just to be clear, then, the history

20   and characteristics of the defendant, I think that given

21   that his position of trust -- you know, while I do

22   appreciate that he has served in the military -- I mean, I

23   think, again, to me, that all means that he should have

24   known better what he was doing.  He was in a heightened

25   position in a better situation to know what he was doing was

1    wrong; and so I think it was -- for that reason, it weighs

2    in favor of detention.

3           Finally, a danger to the community; this is the

4    most critical, frankly, fact -- this circumstance.  I will

5    first note that the defendant is alleged by proffer to have

6    harmed police officers, actively engaged in physical contact

7    with them, and to have -- to say that, you know, we don't

8    know how we got the police shield -- it does not matter.  I

9    think it is fairly self-evident:  Unless you are a police

10   officer, you should not be handling the tools of the trade

11   of a police officer.  So when he took one and went to harm

12   police officers with that or -- and when he had one

13   anyway -- again, that was -- to me, demonstrates a lack of

14   belief in the rule of law and -- both directly by taking

15   that piece of equipment and then using it against police

16   officers and to try to force his way down a tunnel -- I

17   think that that's clear, that that demonstrates a danger to

18   the community.

19          I think that there is -- you know, the government

20   proffers, on page 6 of the detention memorandum, that the

21   crime was captured on video, also hindering an officer

22   seeking to help another officer who had been dragged into

23   the mob on the lower terrace.  They do say that in a

24   footnote which is noted by the defendant -- that he then

25   changed his behavior and went and attempted to aid the

1    officer.

2            You know, it's hard to square that conduct because

3    you're first hindering and stopping a police officer who was

4    being dragged, you know, in this chaotic riot where their

5    lives were at risk, but then coming to your senses in making

6    a better decision to try to help them.  I think that -- at

7    the end, that just still demonstrates to me that the

8    defendant is both capable and likely to make bad decisions

9    that may result in damage to human life and danger to the

10   community.  He may know better, yet still his actions mean

11   that initially his -- for whatever reasons he has inflamed

12   his passions, that he will make bad choices, or can and has

13   a propensity to make them going forward.

14           I think additionally the defendant had a role as a

15   leader -- not in the sense that he was elected or anything

16   like that; he was literally directing people:  We need fresh

17   people, we need fresh people; that is what the quotes are

18   from the government.  And that, you know, he is in the --

19   near the front of the line fighting the officers as

20   described by the government.

21           You know, the chief judge in her opinion

22   recently -- she had a long opinion going through some of the

23   factors that look at, I think, violence towards police

24   officers.  I think statements beforehand -- which there are

25   none of here -- statements during which there are some of

1    concern here -- but then also being a leader of the group --

2    of the chaotic riot -- if you take a position of authority

3    over them, that that absolutely exacerbates the danger that

4    occurred.  And it concerns me that you again may take that

5    position of leadership and will go to seek to lead people

6    again to go again; that you will be at the front of the mob

7    battling the officers who are protecting the entryway.

8              In terms of the danger, I need to look no further

9    than the Capitol Building.  We still -- it appears that the

10   security and fate of the republic hangs in the balance

11   because it is an armed fortress.  There is -- from what is

12   apparent I think to anyone around the Capitol, the only

13   reason there has been no additional attacks is that there is

14   a continued defense, a military defense, that has been put

15   up -- a perimeter -- around all of these buildings

16   precluding anyone short of an invading force coming in.

17   That seems to indicate to me, including that recently there

18   have been heightened concerns that there continues to be a

19   threat to the safety, and that there is a threat from people

20   who want to continue to overthrow the results of a lawful

21   and fair election.

22             So given that's the case, I think that there is

23   not an inchoate danger, there is a real danger of violence;

24   and that if someone is an organizer or a leader, or someone

25   who is in a position of authority, were not detained, that

1    they may lead other people again to go back and seek to

2    conduct such violence.  So, for all of those reasons, I find

3    detention is appropriate.

4              As I've stated, you have the ability to, at any

5    time, to appeal that decision to the chief judge or, if the

6    case is indicted, to the district judge who will be assigned

7    this matter.

8              Ms. Bond, do you want to set a -- 14 days are you

9    seeking for your preliminary hearing, or would you like to

10   go sooner than that?

11             MS. BOND:  Your Honor, 14 days is what the

12   government is asking.

13             THE COURT:  Mr. Woodward, that date -- let's

14   see -- let me take a look at the calendar -- will put us at

15   the 23rd of March.  I want to confirm if you want to go then

16   or if you will need additional time.

17             MR. WOODWARD:  Your Honor, I have a conflict on

18   the 23rd.  I can do the 24th or the 22nd.

19             THE COURT:  I'd like to go -- let me see.  One

20   second.

21             I would prefer to go before.  Is the government

22   able to go on the 22nd?

23             MS. BOND:  I am, Your Honor; and I prefer that

24   over the 24th.

25             I will wait until my colleague is able to confirm

1  that she is available as well.

2          THE COURT:  Okay.  We got a thumbs up.

3          MS. BOND:  It looks like it.

4          THE COURT:  Okay.  Great.

5          So the 22nd we will set it for.  I prefer not to

6  have you-all just hanging around while we're handling other

7  matters.

8          Why don't we just say -- Ms. Lavigne-Rhodes, what

9  do you want to say?  Three o'clock, 2:30?

10          THE COURTROOM DEPUTY:  Three o'clock will be

11  perfect, yes.

12          THE COURT:  Thank you.

13          Ms. -- well, Mr. Woodward, let me come back to

14  you.  Do you have anything else you need to be heard on

15  today?

16          MR. WOODWARD:  No, Your Honor.  If possible, we

17  would request a breakout room, but, otherwise, nothing from

18  us.

19          THE COURT:  Yes.  Of course.  Absolutely.

20          And I just want to note again, for the record, how

21  impressed I was by your thoroughness and diligence.  I think

22  that was very -- you were very persuasive.  I appreciate

23  your diligence to this case and to the defendant.

24          I will remind the defendant that, in spite of what

25  he may think that my ruling means, in no way does it mean

1   anything other than he is innocent; and that is something

2   that I remind every defendant who is before me.

3          I have to weigh the evidence, but that is just a

4   different standard for detention.  But both I and any

5   district judge that he would be before will continue to

6   believe he is innocent because that's what the rule of law

7   tells us to do.  So I thank you, Mr. Woodward.

8          Ms. Bond, anything else on your end?

9          MS. BOND:  Yes, Your Honor.

10          We're asking that in the interest of justice that

11   the Speedy Trial Act clock be tolled until the next

12   preliminary hearing date.

13          While we do know a lot about Mr. Klein's case

14   specifically, it is a complex case, and it is connected to

15   so many other defendants and discovery is going to be so

16   voluminous, and so we are asking that time be tolled.

17          THE COURT:  Mr. Woodward.

18          MR. WOODWARD:  We oppose.  I heard Ms. Bond's

19   colleague say exactly the same thing for a client that has

20   been released to sleep in his car tonight.  So we would

21   not -- we would not agree to the government's request.

22          THE COURT:  Of course.  Yes.

23          So part of the time is excluded, I believe,

24   pursuant to the chief judge's standing order.  In addition,

25   I do find that it is in the interest of justice to exclude

1    time between now and the next hearing date which is 13 days

2    away.  I think doing so is in the interest of justice

3    because it allows what is an incredibly complex case that --

4    which the likes have not been seen, frankly, ever maybe, if

5    not certainly for many, many years.

6            The volume of defendants, the volume of discovery,

7    the nature of that discovery -- I think also due to the

8    ongoing pandemic it is reasonable to give additional time to

9    the government in order to pause the speedy trial clock.

10   Again, it's only for 14 days, and the defendant has the

11   right to be heard again at that time.

12           Exclusion is appropriate, but, for now, I think

13   it's in -- the interest of justice outweighs the defendant's

14   and the public's right to a speedy trial.

15           Anything else from your end, Ms. Bond?

16           MS. BOND:  No, Your Honor.

17           THE COURT:  Okay.  Mr. Woodward, I am going to put

18   you and --

19           MR. WOODWARD:  (Audio unintelligible.)

20           THE COURT:  Yes.  Okay.  I see both of you.  So

21   we'll put both of you into a breakout room.

22           Mr. Klein, you are going to go into a breakout

23   room next with your two attorneys.  And they'll be speaking

24   with you while we continue on with another matter, but this

25   matter is concluded for today.  Your next hearing will be in

1    13 days.

2            Unlike in this hearing, that will not be one where

3    the government can go by proffer.  Then your counsels both

4    will have an opportunity to object to the submission of

5    evidence; they will get to cross-examine witnesses.  The

6    government will have to put on a witness.  They cannot just

7    go by proffer, and so that is certainly a much more robust

8    hearing where counsel has a far greater opportunity to pick

9    apart -- which it sounds like they have some arguments to be

10    made -- as to whether they think that there was -- you know,

11    there is probable cause.

12            So, Mr. Klein, you will be sent to a breakout room

13    now with Mr. Woodward and his co-counsel.  Okay?

14            Ms. Lavigne-Rhodes, you can go ahead and -- she's

15    already working her magic.  Thank you.

16            Once you are done, Ms. Lavigne-Rhodes, can you

17    call the next case?

18            Ms. Nielsen and Ms. Bond, you are obviously

19    excused.  Thank you very much.

20            (Whereupon, the proceeding concludes, 3:47 p.m.)

21

22

23

24

25

## <u>CERTIFICATE</u>

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
transcript of the FTR Gold software proceedings, and is a
full, true, and complete transcript of the proceedings
transcribed to the best of my ability.

PLEASE NOTE:  This hearing was held via
videoconference and telephonically in compliance with the
COVID-19 pandemic stay-safer-at-home recommendations and is
therefore subject to the limitations associated with the use
of technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
videoconferencing capabilities.

This certificate shall be considered null and void
if the transcript is disassembled and/or photocopied in any
manner by any party without authorization of the signatory
below.

Dated this 21st day of June, 2021.

<u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
Official Court Reporter